Nos. 20-2073, -2142

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

INDIVIOR UK LIMITED,

*Appellant*,

v.

DR. REDDY'S LABORATORIES S.A. and DR. REDDY'S LABORATORIES, INC.,

*Cross-Appellants*.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, No. IPR2019-00329

## APPELLEES/CROSS-APPELLANTS' OPENING AND RESPONSE BRIEF

Ira J. Levy
Alexandra D. Valenti
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel.:  212.813.8800
Fax.:  212.355.3333

*Counsel for Cross-Appellants Dr.
Reddy's Laboratories S.A. and Dr.
Reddy's Laboratories, Inc.*

February 18, 2021

Kevin P. Martin
Elaine Herrmann Blais
Robert Frederickson, III
Edwina B. Clarke
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: 617.570.1000
Fax.: 617.523.1231

## '454 PATENT CLAIMS AT ISSUE

**1.** An oral, self-supporting, mucoadhesive film comprising:

(a) about 40 wt % to about 60 wt % of a water-soluble polymeric matrix;

(b) about 2 mg to about 16 mg of buprenorphine or a pharmaceutically acceptable salt thereof;

(c) about 0.5 mg to about 4 mg of naloxone or a pharmaceutically acceptable salt thereof; and

(d) an acidic buffer;

wherein the film is mucoadhesive to the sublingual mucosa or the buccal mucosa;

wherein the weight ratio of (b):(c) is about 4:1;

wherein the weight ratio of (d):(b) is from 2:1 to 1:5; and

wherein application of the film on the sublingual mucosa or the buccal mucosa results in differing absorption between buprenorphine and naloxone, with a buprenorphine $C_{max}$ from about 0.624 ng/ml to about 5.638 ng/ml and a buprenorphine AUC from about 5.431 hr*ng/ml to about 56.238 hr*ng/ml; and a naloxone $C_{max}$ from about 41.04 pg/ml to about 323.75 pg/ml and a naloxone AUC from about 102.88 hr*pg/ml to about 812.00 hr*pg/ml.

**7.** The film of claim 1, wherein the film comprises about 48.2 wt % to about 58.6 wt % of the water soluble polymeric matrix.

**8.** The film of claim 7, wherein the film comprises about 48.2 wt % of the water soluble polymeric matrix.

**12.** The film of claim 1, wherein the ratio of (d):(b) is from about 1:1 to 1:5; wherein the weight ration of (b):(a) is from about 1:3 to about 1:11.5; and wherein the film comprises about 48.2 wt % to about 58.6 wt % of the water soluble polymeric matrix.

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellants Dr. Reddy's Laboratories S.A. and Dr. Reddy's Laboratories, Inc., certifies:

1. **The full name of every party or amicus represented by me is:** Dr. Reddy's Laboratories S.A.; Dr. Reddy's Laboratories, Inc.

2. **The name of the real party in interest represented by me is:** N/A

3. **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:** Dr. Reddy's Laboratories Ltd.; Dr. Reddy's Laboratories S.A.

4. **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in the court (and who have not or will not enter an appearance in this case) are:** Goodwin Procter LLP: John Coy Stull

5. **The title and number of any case known to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:**

   *Indivior Inc. v. Dr. Reddy's Laboratories S.A.*, No. 2:17-cv-07111 (D.N.J.)

   *Indivior Inc. v. Alvogen Pine Brook LLC*, No. 2:17-cv-07106 (D.N.J.)

   *Indivior Inc. v. Teva Pharmaceuticals USA, Inc.*, No. 2:17-cv-07115 (D.N.J.)

6. **Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):** N/A.

February 18, 2021

/s/ *Kevin P. Martin*
Kevin P. Martin

*Counsel for Cross-Appellants Dr.
Reddy's Laboratories S.A. and Dr.
Reddy's Laboratories, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................- 1 -

STATEMENT OF THE ISSUES.................................................4

STATEMENT OF THE CASE...................................................5

    A.    The '454 Patent .........................................................6

    B.    The '571 Application.................................................8

    C.    The Inter Partes Review ........................................14

    D.    The Board Holds That All But One Of The Challenged Claims Are Unpatentable.................................................17

SUMMARY OF ARGUMENT .................................................21

ARGUMENT ........................................................................24

I.    INDIVIOR HAS WAIVED ANY CHALLENGE TO THE BOARD'S DECISION CONCERNING THE (B):(A) RATIO, AND SO CLAIMS 5 AND 12 ARE UNPATENTABLE...........................................24

II.    THE BOARD CORRECTLY HELD THAT CLAIMS 1, 7, AND 12 LACK WRITTEN DESCRIPTION SUPPORT........................................25

    A.    Standard Of Review .................................................25

    B.    The Board's Decision Does Not Result From Any Legal Error.........26

        1.    The Board Did Not Require Express Disclosure....................26

        2.    The Board Did Not Apply The Wrong Burden Of Proof. .......30

        3.    The Board Correctly Found That Dr. Cremer Improperly Worked Backward From The Claims. ....................................31

        4.    The Board Did Not Misapply Precedent Regarding Written Description Support For Claimed Ingredient Ranges. ..................................................................34

C.     The Board's Decision Is Supported By Substantial Evidence...........48

     1.     The Board's Findings Were Supported By Substantial Evidence....................................................................................49

     2.     Indivior Relies Almost Exclusively On The Opinions Of Its Expert, Whose Opinions The Board Found Not Credible....................................................................................52

     3.     The Board Did Not Introduce Any Inconsistency In Its Decision By Finding That The Polymer Weight Percentage Is "Important."........................................................58

     4.     The Board Did Not Misinterpret Table 5................................59

III.    THE BOARD ERRED IN HOLDING THAT CLAIM 8 HAS WRITTEN DESCRIPTION SUPPORT IN THE '571 APPLICATION. ..........................................................................61

CONCLUSION ....................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................................... 61

*In re Bimeda Rsch. & Dev. Ltd.*,
  724 F.3d 1320 (Fed. Cir. 2013) ........................................................... 25

*In re Blaser*,
  556 F.2d 534 (C.C.P.A. 1977) ....................................................... 44, 55

*In re Curtis*,
  354 F.3d 1347 (Fed. Cir. 2004) ........................................................... 65

*D Three Enters., LLC v. SunModo Corp.*,
  890 F.3d 1042 (Fed. Cir. 2018) ........................................................... 53

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................... 25

*Gen. Hosp. Corp. v. Sienna Biopharms., Inc.*,
  888 F.3d 1368 (Fed. Cir. 2018) ................................................... *passim*

*Hyatt v. Boone*,
  146 F.3d 1348 (Fed. Cir. 1998) ........................................................... 24

*Indivior Inc. v. Dr. Reddy's Labs., S.A.*,
  752 F. App'x 1024 (Fed. Cir. 2018) ...................................................... 1

*Indivior Inc. v. Dr. Reddy's Labs., S.A.*,
  930 F.3d 1325 (Fed. Cir. 2019) ........................................................ 1, 5

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ............................................................. 25

*Kolmes v. World Fibers Corp.*,
  107 F.3d 1534 (Fed. Cir. 1997) ...................................................... 45, 46

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) ..................................................37, 57

*Martek Bioscis. Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ...........................................38

*Nalpropion Pharms., Inc. v. Actavis Labs. FL, Inc.*,
    934 F.3d 1344 (Fed. Cir. 2019) ..................................................*passim*

*Novozymes A/S v. DuPont Nutrition Biosci. APS*,
    723 F.3d 1336 (Fed. Cir. 2013) ...........................................32

*ParkerVision, Inc. v. Qualcomm Inc.*,
    903 F.3d 1354 (Fed. Cir. 2018) ...........................................25

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ...........................................29

*Purdue Pharma L.P. v. Faulding Inc.*,
    230 F.3d 1320 (Fed. Cir. 2000) ..................................................*passim*

*Quake v. Lo*,
    928 F.3d 1365 (Fed. Cir. 2019) ...........................................29

*In re Ruschig*,
    379 F.2d 990 (C.C.P.A. 1967) ..................................................32, 33

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
    734 F.3d 1332 (Fed. Cir. 2013) ...........................................65

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998) ...........................................37

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018) ...........................................45

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ..................................................44, 45

*Vicor Corp. v. SynQor, Inc.*,
    869 F.3d 1309 (Fed. Cir. 2017) ...........................................59

*In re Wako Pure Chem. Indus. Ltd.*,
   4 F. App'x 853 (Fed. Cir. 2001) ............................................................41

*In re Wertheim*,
   541 F.2d 257 (C.C.P.A. 1976) ......................................................*passim*

*Yorkey v. Diab*,
   601 F.3d 1279 (Fed. Cir. 2010) ...........................................26, 31, 52

*Reckitt Benckiser Pharms., Inc. v. Watson Labs., Inc.*,
   2016 WL 3186659 (D. Del. June 3, 2016) .........................................5

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '454 patent | U.S. Patent No. 9,687,454 |
| '832 patent | U.S. Patent No. 8,475,832 |
| '571 application | Application No. 12/537,571 (filed August 7, 2009) |
| Board | Patent Trial and Appeal Board |
| DRL | Cross-Appellants Dr. Reddy's Laboratories S.A. and Dr. Reddy's Laboratories, Inc. |
| Indivior | Appellant Indivior UK Limited |
| IPR | *Inter partes* review |
| Myers | Myers et. al., *Sublingual and Buccal Film Compositions*, U.S. Patent Publication No. US 2011/0033541 A1 (Feb. 10, 2011) |
| POSA | Person of ordinary skill in the art |

## STATEMENT OF RELATED CASES

No appeal in this case was previously before this Court or any other

appellate court.

The following cases may be affected by this Court's decision in this case:

*Indivior Inc. v. Dr. Reddy's Laboratories S.A.*, No. 2:17-cv-07111 (D.N.J.)

*Indivior Inc. v. Alvogen Pine Brook LLC*, No. 2:17-cv-07106 (D.N.J.)

*Indivior Inc. v. Teva Pharmaceuticals USA, Inc.*, No. 2:17-cv-07115 (D.N.J.)

# INTRODUCTION

This is the third appeal to reach this Court from appellant Indivior's multi-lawsuit effort to exclude generic versions of its Suboxone film, an opioid abuse disorder medication, from the market.   After losing two earlier trials against appellee-cross appellant DRL,[1] including a judgment that its '832 patent is invalid, Indivior cancelled all the claims in a then-pending continuation application from the '832 patent.   It replaced them with new claims, containing makeweight limitations unrelated to the claimed films' allegedly inventive aspects, to try to avoid replicating the '832 patent's fate.   Although an examiner approved the application and the PTO issued the '454 patent, the Board invalidated certain of the '454 patent's claims in an *inter partes* review brought by DRL.   The Board found that the new limitations lacked written description support in an earlier application, the '571 application, and that the new claims were invalid as anticipated without the '571 application's priority date.

Indivior's appeal to this Court—which explicitly disclaims any challenge to one of the two grounds for the Board's decision, and so implicitly concedes that claims 5 and 12 of the '454 patent are invalid—serially mischaracterizes the decision below.   Most notably, in a bid to obtain *de novo* review, Indivior asserts

---

[1] This Court affirmed those two judgments on appeal.   *See Indivior Inc. v. Dr. Reddy's Laboratories, S.A.*, 930 F.3d 1325 (Fed. Cir. 2019); *see also Indivior Inc. v. Dr. Reddy's Laboratories, S.A.*, 752 F. App'x 1024 (Fed. Cir. 2018) (vacating preliminary injunction against DRL in a third case).

that the Board committed several errors of law—that the Board improperly reversed the burden of proof, imposed an *in haec verba* disclosure requirement, and misapplied precedent involving written description support for claimed ingredient ranges. But the Board did no such things. The decision below explicitly recognized that the burden of proof lay with DRL, and it held DRL to that burden, extensively summarizing DRL's arguments and evidence and ultimately agreeing with DRL and its expert instead of Indivior and its expert. The Board also explicitly recognized that claim limitations need not appear *in haec verba* in the specification, and that instead the question is whether a POSA would "immediately discern" the limitations from the specification. Applying that standard, the Board found a lack of written description after crediting DRL's expert's testimony that the specification would not "reasonably convey" the claimed ranges to a POSA. And with respect to the "ranges" issue, the Board correctly applied this Court's precedents in *General Hospital Corporation v. Sienna Biopharmaceuticals, Inc.*, 888 F.3d 1368 (Fed. Cir. 2018), and *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed. Cir. 2000), in finding that the '571 application lacked "blaze marks" for the claimed ranges.

Indivior's assertion that the Board's decision is unsupported by substantial evidence rests on no sounder footing. The Board, crediting the testimony of DRL's expert Dr. Das, found that the '571 application did not provide written

description support for claimed polymer weight ranges of about "40 wt % to about 60 wt %," or "about 48.2 wt % to about 58.6 wt %." It observed that the '571 application actually taught away from the claimed ranges, by instructing that the allegedly inventive films can contain "any desired level of self-supporting film forming polymer," and by disclosing an open-ended range—"at least 25%"—that begins far below the claimed ranges and hints at no upper bound. Other than such bare snippets, the '571 application did not discuss the film's polymer weight percentage at all, focusing instead of the *type* of polymer used and other aspects of the film. Meanwhile, the Board found that the conclusory testimony of Indivior's expert, Dr. Cremer, was not credible, dedicating an entire section of its decision to compiling examples of Dr. Cremer's evasive, unbelievable testimony—for example, his refusal to testify whether two weight percentages within the claimed ranges related to the same invention. Indivior's argument on appeal turns entirely on its repeated insistence that the '571 application disclosed a bounded polymer range of 25 to 58.6 wt %, but that is flatly untrue. The '571 application on its face recites *no* bounded ranges, much less the claimed bounded range. Indivior is relying entirely on Dr. Cremer's unbelievable testimony to establish the existence of a bounded range, and the Board had a substantial evidentiary basis for rejecting that testimony.

For the foregoing reasons, the Court should affirm the Board's decision

invalidating certain claims of the '454 patent. At the same time, DRL is cross-appealing the Board's decision not to invalidate claim 8, which claims a film with a polymer weight percentage of "about 48.2%." While the '571 application did provide an example of a film containing four different polymers with weight percentages of 4.82%, 27.09%, 12.04%, and 4.22%, the application never observed that those percentages added up to "about 48.2%" or suggested that the *aggregate* weight of 48.2%, as opposed to the different polymers' *individual* weights, was significant or inventive. To the contrary, the application taught away from any emphasis on that example's aggregate polymer weight, by emphasizing the importance of the blend of specific polymers of different molecular weights selected, by disclosing that "any desired level" of polymer could be used, and teaching that only 25 wt % might be enough. A POSA seeing that example therefore would not have assigned significance to its unstated aggregate polymer weight, much less understood Indivior to have determined that the wide universe of polymer blends that happen to add up to about 48.2% (or a single polymer in that amount) all work in the invention. For this reason, the Board's decision with respect to claim 8 only should be reversed.

## STATEMENT OF THE ISSUES

1. Indivior disclaims any challenge to the Board's holding that the ratio of buprenorphine to polymer ratio (the "(b):(a)" ratio) recited in claims 5 and 12 does

not have written description support in the '571 application. Should this Court therefore affirm the Board's decision that claims 5 and 12 are not patentable?

2. The Board found that the ranges of polymer weight percentage recited in claims 1, 7, 9, and 12 of the '454 patent—specifically, "about 40 wt % to about 60 wt %" or "about 48.2 wt % to about 58.6 wt %"—do not have written description support in the '571 application. Was the Board's analysis legally sound and its finding supported by substantial evidence?

3. The Board found that the '571 application contains adequate written description for Claim 8, which recites a film with a polymer weight percentage of "about 48.2%." Was this finding supported by substantial evidence?

## STATEMENT OF THE CASE

Faced with a federal court decision finding that claims in the parent '832 patent were invalid as obvious over the prior art, Indivior cancelled all the claims of a continuation application that claimed priority to the same application from which the '832 patent had issued—the '571 application, filed on August 7, 2009— and added new claims with new limitations reciting specific polymer weight percentage ranges. Appx10; *see also Reckitt Benckiser Pharms., Inc. v. Watson Labs., Inc.*, 2016 WL 3186659 (D. Del. June 3, 2016), *aff'd in part and vacated in part*, *Indivior Inc. v. Dr. Reddy's Labs., S.A.*, 930 F.3d 1325 (Fed. Cir. 2019). The amended application issued on June 27, 2017, as the '454 patent. Appx10. DRL

sought *inter partes* review of most of the claims in the '454 patent. It is undisputed that the challenged claims are anticipated by Myers, which was published in 2011, unless the '454 patent can claim the '571 application's 2009 priority date. *See* Indivior's Corrected Principal Br. 21-22 ("Indivior Br."); Appx82. The only question on appeal is whether the polymer weight percentage limitations of the challenged claims have written description support in the '571 application.

### A.    The '454 Patent

The '454 patent is titled "sublingual and buccal film compositions." Appx605. The challenged claims are directed toward a film dosage form of the prior art Suboxone® tablet—a sublingual tablet containing the active ingredients buprenorphine and naloxone, used to treat opioid abuse disorder. Appx610(1:43-2:67). Claim 1, the only independent claim at issue here, recites (with the disputed limitations emphasized):

> 1. An oral, self-supporting, mucoadhesive film comprising:
>
> (a) about ***40 wt % to about 60 wt %*** of a water-soluble polymeric matrix;
>
> (b) about 2 mg to about 16 mg of buprenorphine or a pharmaceutically acceptable salt thereof;
>
> (c) about 0.5 mg to about 4 mg of naloxone or a pharmaceutically acceptable salt thereof; and
>
> (d) an acidic buffer;

> wherein the film is mucoadhesive to the sublingual mucosa or the buccal mucosa;
>
> wherein the weight ratio of (b):(c) is about 4:1;
>
> wherein the weight ratio of (d):(b) is from 2:1 to 1:5; and
>
> wherein application of the film on the sublingual mucosa or the buccal mucosa results in differing absorption between buprenorphine and naloxone, with a buprenorphine $C_{max}$ from about 0.624 ng/ml to about 5.638 ng/ml and a buprenorphine AUC from about 5.431 hr*ng/ml to about 56.238 hr*ng/ml; and a naloxone $C_{max}$ from about 41.04 pg/ml to about 323.75 pg/ml and a naloxone AUC from about 102.88 hr*pg/ml to about 812.00 hr*pg/ml.

Appx621(24:24-46) (emphasis added).

Indivior also challenges the Board's decision on dependent claims 7 and 12—although, as discussed below, Indivior expressly disclaims any challenge to one of the Board's two reasons for finding claim 12 invalid, making its appeal with respect to that claim dead on arrival. Dependent claim 7 recites:

> 7. The film of claim 1, wherein the film comprises ***about 48.2 wt % to about 58.6 wt %*** of the water soluble polymeric matrix.

Appx621(24:57-59) (emphasis added). Dependent claim 12 recites:

> 12. The film of claim 1, wherein the ratio of (d):(b) is from about 1:1 to 1:5; wherein the weight ratio of (b):(a) is from about 1:3 to about 1:11.5; and wherein the film comprises ***about 48.2 wt % to about 58.6 wt %*** of the water soluble polymeric matrix.

Appx622(25:3-7) (emphasis added).

DRL cross-appeals the Board's decision with respect to dependent claim 8:

> 8. The film of claim 7, wherein the film comprises ***about 48.2 wt %*** of the water soluble polymeric matrix.

Appx621(24:60-61) (emphasis added).

## B.    The '571 Application

The '571 application, which Indivior contends provides written description support for the polymer weight percentages claimed in the '454 patent, describes an invention that relates to compositions of "films containing therapeutic actives." Appx3350(¶0001).    As one embodiment of the invention, it describes treating narcotic dependence with an orally dissolvable film dosage of buprenorphine and naloxone, with an effect that is bioequivalent to the prior art Suboxone® tablets containing the same actives.    Appx3350-3351(¶¶0003-0005), Appx3355(¶0022). The application discloses that the inventive film should contain an active, a buffer, a polymer, and may contain components including coloring agents and sweeteners. Appx3351(¶0006), Appx3359-3363(¶¶0034-0050).    The application discloses that the buffer is used for maintaining the film's pH, which is necessary for optimizing the levels of absorption of the active ingredients and achieving the desired bioequivalent effect.    Appx1374(¶62); Appx3366(¶0061).

The application discloses, and dedicates numerous paragraphs to explaining, that the *type* of polymer used has consequences for a film's effectiveness, and that one must "select polymers that provide mucoadhesive properties to the film, as

well as a desired dissolution and/or disintegration rate." Appx3358(¶0030). The application teaches that whether a film is fast dissolving or slow dissolving generally is determined by the polymers' molecular weight, and that "[f]or the instant invention, it is preferable to use films that fall between the categories of fast dissolving and moderate dissolving." Appx3354(¶¶0019-0020); *see also* Appx1375(¶63) (Dr. Das: "For achieving desired mucoadhesive and disintegration properties of the film, the '571 application identifies the selection of various polymers, not the total amount of polymer to be used."); Appx1379(¶72) (Dr. Das: "[T]he '571 application identifies the selection of polymers as important to the mucoadhesive and disintegration properties of the films . . . .").

The application explains that the polymer polyethylene oxide ("PEO") may be used, and that the molecular weight of the PEO is tied to the film's properties: "[i]n some embodiments, high molecular weight polyethylene oxide . . . may be desired to increase mucoadhesivity of the film," whereas in "other embodiments," lower molecular weight PEO is used. Appx3359(¶0033). It states that "it may be desirable to combine high molecular weight (600,000 to 900,000) with low molecular weight (100,000 to 300,000) polyethylene oxide in the polymer component." Appx3359(¶0033). It observes that PEO may be used in combination with other polymers, including "hydroxypropylmethyl cellulose," or "HPMC." Appx3359(¶0032). If PEO is combined with another polymer, the

application teaches, then care should be given to their relative percentages—"[i]n accordance with some embodiments, polyethylene oxide may range from about 20% to 100% by weight in the polymer component, more specifically about 30% to about 70% by weight, and even more specifically about 40% to about 60% by weight." Appx3359(¶0032).[2] In all, the application spends at least ten paragraphs discussing the types of polymers to be used in the invention, including their molecular weights and the proportion of PEO if used in combination with another polymer. Appx3354-3359(¶¶0019-0020, 0025-0030, 0032-0033).

In contrast to this extensive focus on *type*, the application discloses very little regarding the total *amount* of polymer that should be used. The summary of the invention is completely silent on the issue. Indivior conceded below that if the '454 patent has written description support in the '571 patent, then it can be found only in Paragraph 65, Table 1, and Table 5. Appx198-206; Appx372-383, Appx390-394; Appx504-518.

*Paragraph 65:* Paragraph 65 states that "any desired level" of polymer may be used so long as the film is "self-supporting," and provides, as example embodiments, films with polymer that makes up "at least 25%" and "at least 50%" of the films by weight. Appx3367(¶0065). Paragraph 65 nowhere discloses any

---

[2] It is undisputed that these ranges refer to the percentage of PEO in the polymer, *not*, as in the claims, the percentage of polymer in the film. Appx3860-3861.

*upper* bound for the percentage of polymer.

*Table 1:*  In Example 1, "[f]our different strength film compositions were prepared" containing buprenorphine/naloxone amounts of 16/4 mg, 12/3 mg, 8/2 mg, and 2/0.5 mg.  Appx3372(¶0081).  The films are detailed in Table 1:

TABLE 1

| Various Compositions of Film Dosages | | | | |
|---|---|---|---|---|
| | Buprenorphine/ Naloxone Films Unit Formula (mg per film strip) Buprenorphine/ Naloxone Ratios | | | |
| Components | 16/4 | 12/3 | 8/2 | 2/0.5 |
| Active Components | | | | |
| Buprenorphine HCl | 17.28 | 12.96 | 8.64 | 2.16 |
| Naloxone HCl Dihydrate | 4.88 | 3.66 | 2.44 | 0.61 |
| Inactive Components | | | | |
| Polyethylene Oxide, NF (MW 200,000) | 27.09 | 20.32 | 13.55 | — |
| Polyethylene Oxide, NF (MW 100,000) | 12.04 | 9.03 | 6.02 | 19.06 |
| Polyethylene Oxide, NF (MW 900,000) | 4.82 | 3.62 | 2.41 | 2.05 |
| Maltitol, NF | 12.04 | 9.03 | 6.02 | 5.87 |
| Flavor | 6.0 | 4.5 | 3.0 | 2.4 |
| Citric Acid, USP | 5.92 | 4.44 | 2.96 | 2.96 |
| HPMC | 4.22 | 3.16 | 2.11 | 2.34 |
| Ace-K | 3.0 | 2.25 | 1.5 | 1.2 |
| Sodium Citrate, anhydrous | 2.68 | 2.01 | 1.34 | 1.34 |
| Colorant | 0.03 | 0.02 | 0.01 | 0.01 |
| Total (mg) | 100 | 75 | 50 | 40 |

Appx3372-3373(¶0081).     Consistent with the specification's discussion of combining PEOs of different molecular weights, and combining PEO with a non-

PEO polymer, Table 1 lists four specific polymers:   three PEOs in different molecular weights (100,000; 200,000; and 900,000) and HPMC.  It also identifies the individual weights for each of those polymers in the example films.   But nowhere does Example 1 indicate the *aggregate* weight of the polymers.   If, nonetheless, one were to do the math, when the weights of those polymers are added and calculated as a percentage of the total weight of each film, the respective polymer weight percentages of the 16/4, 12/3, 8/2, and 2/0.5 mg formulations are 48.2%, 48.2%, 48.2%, and 58.6%.   Appx1381(¶¶74-75).   Those percentages, however, go unmentioned anywhere in the '571 application.   The application contains no example of a film composed of 58.6% polymer by weight for any dosage strength other than the 2/0.5 mg formulation.  And the application nowhere discloses whether the example 2/0.5 mg film formulation with the unstated 58.6 wt % even worked for purposes of the invention.

*Table 5:*  In Example 5, the inventors prepared three test films, each with 8 mg of buprenorphine and 2 mg of naloxone.  Appx3376(¶0089).  Each film was "buffered to a different pH."   Appx3376(¶0089).   Table 5 lists the films' ingredients:

TABLE 5

| Component | Test formulation 1 8 mg/2 mg pH = 6.5 | | Test formulation 2 8 mg/2 mg pH = 3-3.5 | | Test formulation 3 8 mg/2 mg pH = 5-5.5 | |
|---|---|---|---|---|---|---|
| | % w/w | Mg/film | % w/w | Mg/film | % w/w | Mg/film |
| Buprenorphine HCl | 21.61 | 8.64 | 17.28 | 8.64 | 17.28 | 8.64 |
| Naloxone HCl Dihydrate | 6.10 | 2.44 | 4.88 | 2.44 | 4.88 | 2.44 |
| Polymer | 5.05 | 2.02 | 4.82 | 2.41 | 4.82 | 2.41 |
| Polymer | 28.48 | 11.39 | 27.09 | 13.55 | 27.09 | 13.55 |
| Polymer | 12.65 | 5.06 | 12.04 | 6.02 | 12.04 | 6.02 |
| Polymer | 4.43 | 1.77 | 4.22 | 2.11 | 4.22 | 2.11 |
| Sweetener | 12.65 | 5.06 | 12.04 | 6.02 | 12.04 | 6.02 |
| Sweetener | 3 | 1.2 | 3 | 1.5 | 3 | 1.5 |
| Flavor | 6 | 2.4 | 6 | 3 | 6 | 3 |
| Citric acid | 0 | 0 | 5.92 | 2.96 | 2.51 | 1.26 |
| Sodium citrate | 0 | 0 | 2.68 | 1.34 | 6.08 | 3.04 |
| FD&C yellow #6 | 0.025 | 0.01 | 0.03 | 0.02 | 0.03 | 0.02 |
| Total | 100 | 40 | 100 | 50 | 100 | 50 |

Formulations of Test Films at Various pH Levels

Appx3376(¶0089). Although the types of polymers are not expressly identified in Table 5, in context those polymers are the same as those in Table 1—*i.e.,* high and low molecular weight PEOs, and HPMC; indeed, test formulation 2 in Table 5 matches the 8/2 mg formulation in Table 1 to a tee. *See* Appx4317-4318 (testimony of Dr. Das). Again, the table does not identify the *aggregate* polymer weight percentage of each film. If a POSA reading the application were nonetheless to do the math, she would see that test formulation 1 has a polymer weight percentage of 50.6%, and formulations 2 and 3 each have a polymer weight percentage of 48.2%. Appx1382(¶77). The '571 application reports that

formulations 1 and 3 *failed*—they did not produce films that were bioequivalent to Suboxone® tablets, and therefore do not embody the invention. *See* Appx3376-3380(¶¶0090-00101).

### C. The *Inter Partes* Review

On November 13, 2018, DRL filed a petition for *inter partes* review of claims 1-5 and 7-14 of the '454 patent. Appx92-140. DRL argued that the polymer weight percentages and ranges recited in claims 1, 7, 8, and 12 do not have written description support in the '571 application. DRL also argued that limitations in claims 5 and 12 directed to the ratio between buprenorphine to polymer—the "(b):(a)" ratio—do not have written description support. The Board instituted *inter partes* review of all the challenged claims. Appx278-306.

Each party presented an expert to opine on the meaning of the '571 application from the perspective of a POSA. It was undisputed that a POSA is a person with "a Master's or Ph.D. in pharmaceutical sciences, formulation chemistry, or a related field, plus a number of years of relevant experience in developing drug formulations." Appx7-8.

DRL's expert, Dr. Das, has a Bachelor's Degree in Pharmacy, a Master's Degree in Pharmaceutics, and a Ph.D. in Pharmaceutical Sciences. Appx4214-4215; Appx1346(¶4); Appx1393. She was specifically trained on "pharmaceutical delivery systems," including pharmaceutical films. Appx4215. She has studied

mucoadhesive polymer films generally and received a grant from the National Institute of Health to study mucoadhesive polymer films that carry the active buprenorphine in particular—the very kind of films at issue here. Appx4216-4220; Appx1347(¶7). She studied those films for six years. Appx4243. As part of her research, she made large batches of mucoadhesive films and examined how different polymers affected the films' adhesive properties and ability to release the active ingredient. Appx4226-4227, Appx4247-4248. She published multiple papers and presented at numerous conferences on her findings. Appx4222-4224; Appx1347-1348(¶¶8-9); Appx1401-1406. At present, Dr. Das is a Professor of Pharmaceutics at Butler University; she has over 20 years of experience teaching pharmaceutical sciences. Appx1347(¶6); Appx1392.

Dr. Das testified that, based on her extensive experience studying mucoadhesive polymer films, "[a] POSA reading the '571 application would not understand the . . . polymer weight ranges [claimed in the '454 patent] . . . were part of the claimed invention." Appx1372(¶59). Dr. Das reasoned that the "only disclosure in the '571 Application of the amount of polymer in the matrix appears in paragraph 65," and that paragraph "broadly asserts that 'any desired level of . . . polymer' can be used in the films and provides minimum guidance as to how much polymer should be present in the film." Appx1373(¶¶60-61). She opined that paragraph 65 "identifies only two alternative embodiments" of the invention, one

with a polymer of "greater than 25%" and the other with a polymer of "greater than 50%," with no identification of the "bottom end of the range" for the invention, and no identification of "the top end range." Appx1373-1374(¶61). As for Tables 1 and 5, Dr. Das opined that there were no "blaze marks" that would have led a POSA to believe that the unstated aggregate polymer weight percentages that could be calculated by summing the weights of the individual polymer components were "important for something." Appx4324-4327.

Indivior's expert, Dr. Cremer, disagreed, testifying that, if one reads between the lines, the '571 application disclosed the claimed polymer weight percentage ranges. Appx4144(¶30). Dr. Cremer asserted that, although no range endpoints were actually disclosed in the application, there must be some "limit to the [polymer] weight [percentage] of the inventive films." Appx3993(¶34). He claimed that because the application stated that a litany of "optional ingredients could be present in the inventive films in varying amounts," by adjusting the amount of any assortment of these ingredients—taking away some ingredients from an example here, adding some ingredients to an example there, and in varying amounts—a POSA could arrive at the claimed ranges. *See* Appx4150(¶37), Appx4151-4154(¶¶39-42), Appx4158-4159(¶¶47-48). He further testified that the exemplary formulations in Tables 1 and 5 are "all part of the same invention," such that a range could be created using the polymer weight percentages in those

- 16 -

formulations as endpoints.    Appx4150-4151(¶¶37-38).    On these bases, he concluded that the application "discloses that the inventors possessed a polymer weight percentage range of 25% to about 58.6%," and so a POSA would have understood that the inventors possessed the narrower claimed ranges. Appx4150(¶37), Appx4158(¶47).

### D.    The Board Holds That All But One Of The Challenged Claims Are Unpatentable.

After a hearing, the Board held for DRL on all but claim 8.  Appx1-88.

1.  *First*, the Board held that the (b):(a) ratio recited in claims 5 and 12 does not have written description support in the '571 application, and therefore claims 5 and 12 are anticipated by Myers.  Appx70-73, Appx81-82.  Indivior has expressly waived any challenge to this aspect of the Board's decision.  *See* Indivior Br. 19 n.4.

2.  *Second*, the Board held that the polymer weight percentage ranges recited in claims 1, 7, and 12—"about 48.2 wt % to about 58.6 wt %" and "about 40 wt % to about 60 wt %"—do not have written description support in the '571 application.  Appx81.  The Board therefore held that all those claims and claims depending from them are anticipated by Myers.  Appx82-86.[3]

In reaching its decision, the Board recognized that "[i]t is not necessary that

---

[3] The Board held that "claims 2–5, 9–11, 13, and 14 also lack written description support due to their dependency from claim 1," and thus are also anticipated by Myers.  Appx81.

the exact terms of a claim be used *in haec verba* in the specification, and equivalent language may be sufficient." Appx81 (quoting *Nalpropion Pharms., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1350 (Fed. Cir. 2019)). The proper question, the Board said, is "whether a POSA would have 'immediately discerned the limitation at issue' from such disclosure." Appx81 (quoting *Nalpropion*, 934 F.3d at 1350). The answer here, the Board held, is no. The Board found that "[n]either paragraph 65, nor Tables 1 or 5, discuss or refer to bounded or closed ranges of polymer weight percentages," and, "although 'we agree with [Indivior] that the disclosures of "at least 25% by weight" and "at least 50% by weight" [in paragraph 65] are necessarily limited to *some* end point, that end point is not disclosed in the '571 application.'" Appx79. Relying on this Court's decision in *General Hospital Corporation v. Sienna Biopharmaceuticals, Inc.*, 888 F.3d 1368 (Fed. Cir. 2018), the Board found that "the disclosure of at least 25% (or at least 50%) 'does not by itself provide written description support for a particular value within that range.'" Appx66 (quoting *General Hospital*, 888 F.3d at 1372).

The Board also found that the disclosures of example films with unstated polymer weight percentages of 48.2 wt % and 58.6 wt % in Tables 1 and 5 are not sufficient to disclose the claimed ranges, because the two tables "simply disclos[e] . . . discrete values associated with particular 'exemplary' formulations rather than range endpoints." Appx66. Moreover, the Board found, "the express

statement in [paragraph 65 of] the '571 application that '[t]he film may contain any desired level of self-supporting film polymer' would lead a POSA away from a particular bounded range of polymer levels."  Appx79; *accord* Appx64.  Table 5 "also leads a POSA away from specific polymer weight percentages and ranges thereof because Test formulation 1 and Test formulation 3 had polymer weight percentages of 50.6% and 48.2%, respectively, that fell within the claimed ranges, but did not produce films bioequivalent to Suboxone® tablets," the stated purpose of the invention.  Appx65.

The Board dedicated a separate section of its decision to explaining Dr. Cremer's lack of credibility as a witness.  Appx73-75.  The Board observed that Dr. Cremer's analysis "reflects an improper approach of simply working backward from the disputed claim limitations to 'find' some alleged written description support"—*i.e.,* by improperly appealing to "hindsight."  Appx80.  For example, Indivior argued that films having polymer weight percentage ranges of "25% to about 58.6%," "about 48.2% to about 58.6%," "41% to 61%," and "40% to 60%" all pertain to "the same invention," but Dr. Cremer testified that he did not consider whether there would be any difference in operability or result between films with 40% polymer and 48.2% polymer.  Appx73-74.  The Board held that "it is not credible to assert that films having polymer weight percentages within a range pertain to the same invention, but then be unwilling to say whether films

having particular polymer weight percentages within that range also pertain to the same invention." Appx74. As another example, Dr. Cremer opined that the '571 application disclosed a range of "about 40 wt % to about 60 wt %" and that films within that polymer weight percentage range pertain to the same invention, while at the same time "refus[ing] to offer an opinion on whether the inventors could have claimed the range of about 45% to about 60% and still have written description support." Appx74. The Board held that "it is not credible to allege that the '571 application supports a particular range of polymer weight percentages and that films having a polymer weight percentage within that range pertain to the same invention, but then be unwilling to say whether the '571 application also supports a *narrower* range within the range." Appx74; *see also* Appx75 (finding that Dr. Cremer's testimony on the (b):(a) ratio is not credible because it is not internally consistent).

Based on the face of the '571 application, the testimony by DRL's expert Dr. Das that it credited, and Dr. Cremer's credibility problems, the Board agreed with DRL that the '571 application did not disclose the claimed polymer weight percentage ranges, and rejected Indivior's argument that it did.

3. *Third*, the Board held that the '571 application does provide written description support for the polymer weight percentage recited in Claim 8: "about 48.2 wt %." Appx63-64, Appx82; Appx621(24:60-61). The Board found that a

- 20 -

POSA could have calculated that three of the films in Table 1 had polymer weight percentages of 48.2%, as did two of the test formulations in Table 5. Appx62-64. The Board therefore held that DRL had failed to show by a preponderance of evidence that claim 8 was unpatentable. Appx86-87.

## SUMMARY OF ARGUMENT

I.     The Court should affirm the Board's decision that claims 5 and 12 do not have written description support in the '571 application, because the application does not disclose the (b):(a) ratio recited in those claims. The Board held as much, and Indivior has not challenged that holding on appeal.

II.     The Court should affirm the Board's holding that the '571 application does not contain written description support for claims 1, 7, and 12, and therefore those claims—and the claims that depend from them—are invalid as anticipated by Myers.

A.     Indivior's four attempts to manufacture legal error fail. *First*, the Board did not require that the claimed polymer ranges be expressly disclosed. To the contrary, the Board explicitly recognized that "*in haec verba*" disclosure is not required, and found instead that a POSA would not have "immediately discerned" the claimed polymer ranges in the '571 application. *Second*, the Board did not misallocate the burden of proof. It expressly recognized that the burden rested on DRL, and found that DRL had met that burden based on Dr. Das's testimony and

- 21 -

DRL's arguments based on that testimony and the face of the '571 application. *Third*, the Board's holding that Dr. Cremer improperly worked backward from the claim limitations is supported by the law and the facts; Dr. Cremer manipulated the language in the application to reach a desired result. *Fourth*, the Board did not misapply this Court's precedent concerning ranges of ingredients. Indivior primarily relies on *In re Wertheim*, but in that case a bounded range was disclosed; here no bounded range is disclosed. Even if a bounded range were disclosed, *Wertheim* does not hold that broader disclosed ranges always provide written description support for narrower ranges. This Court's recent decisions in *General Hospital* and *Purdue Pharma* are more on point, and they support the Board's decision in this case. All the other cases on which Indivior relies are distinguishable.

B.    Substantial evidence supports the Board's decision with respect to claims 1-5, 7, and 9-14. Indivior largely ignores the Board's extensive findings, which were based on the opinion of DRL's expert witness Dr. Das and the face of the '571 application, that the '571 application does not convey possession of the claimed ranges, and in fact "lead[s] a POSA away" from those ranges. Instead of engaging with these findings, Indivior simply recites the opinions of its expert, Dr. Cremer. But the Board found those opinions to be not credible, and Indivior fails to show that "no reasonable trier of fact" could have found as the Board did.

Indivior's two other arguments—that the Board contradicted itself in finding the polymer amount both "important" and not "emphasized," and that the Board misinterpreted Table 5—fail, because there is no contradiction and it is Indivior that proposes an interpretation of Table 5 that has no support in the record.

III.    On DRL's cross-appeal, the Court should reverse the Board's holding that the application adequately describes claim 8's limitation that the polymer make up "about 48.2 wt %" of the film.  The Board based that decision entirely on the examples in Tables 1 and 5, but those tables fall short of disclosing the claimed limitation.  A POSA would not have immediately discerned that the tables disclose an aggregate 48.2 wt % for the polymer, because the tables do not recite that number, focusing instead on the individual polymers selected, which also is the principal focus of the specification.  A POSA therefore would not have understood that the inventors possessed films with a total polymer of 48.2 wt %, *no matter the combination of polymers*.  Table 5 discloses, at best, that the four *specific* polymers used in example 2 were successful when used in combination, and the specification makes clear that not all polymers are interchangeable.

## ARGUMENT

## I.    INDIVIOR HAS WAIVED ANY CHALLENGE TO THE BOARD'S DECISION CONCERNING THE (B):(A) RATIO, AND SO CLAIMS 5 AND 12 ARE UNPATENTABLE.

In the last paragraph of its brief, Indivior argues that the Board's decision

that "claims 1-5, 7, and 9-14 of the '454 patent are unpatentable" is not supported by substantial evidence, and it asks that the "Board's Final Written Decision be reversed," without qualification.  Indivior Br. 67.

Indivior's request that the entire "Final Written Decision be reversed," including with respect to claims 5 and 12, is spurious, because Indivior does not challenge the Board's holding that the ratio of buprenorphine to polymer—the "(b):(a)" ratio—recited in claims 5 and 12 is not disclosed by the '571 application, which is an independent basis for invalidating those two claims.  *See* Appx81-82. In fact, Indivior *disclaims* any challenge to the Board's holding with respect to those two claims:  "Indivior is not appealing the Board's conclusions regarding the (b):(a) ratio limitations of claims 5 and 12."  Indivior Br. 19 n.4.  This Court can affirm the Board's decision that claims 5 and 12 are unpatentable for this reason alone, regardless of the Court's decision with respect to the polymer range issue. *See Hyatt v. Boone*, 146 F.3d 1348, 1354 (Fed. Cir. 1998) ("It is insufficient as written description, for purposes of establishing priority of the invention, to provide a specification that does not unambiguously describe all limitations of the count.").

## II.    THE BOARD CORRECTLY HELD THAT CLAIMS 1, 7, AND 12 LACK WRITTEN DESCRIPTION SUPPORT.

In the face of a straightforward Board decision applying well-established precedent to the facts of this case, Indivior attempts to manufacture legal error to

escape the "substantial evidence" standard of review. The Court should reject Indivior's legal arguments and affirm, because the Board's decision is sound.

## A.    Standard Of Review

This Court reviews the Board's legal holdings de novo and its factual determinations for substantial evidence. *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1360 (Fed. Cir. 2018). Whether the written description requirement is satisfied is a question of fact, and on appeal from the Board, this Court reviews that question for substantial evidence. *In re Bimeda Rsch. & Dev. Ltd.*, 724 F.3d 1320, 1323 (Fed. Cir. 2013). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006).

Substantial-evidence review "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from [the] agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). In applying the substantial evidence standard, this Court "defer[s] to the Board's

findings concerning the credibility of expert witnesses . . . unless no reasonable trier of fact could have" made those findings. *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010).

### B.    The Board's Decision Does Not Result From Any Legal Error.

Indivior identifies four supposed legal errors in the Board's decision. According to Indivior:  (1) the Board required that the claimed polymer weight percentage ranges be *expressly* disclosed in the '571 specification (Indivior Br. 31-40); (2) the Board shifted the burden of proof from DRL to Indivior (Indivior Br. 42-47); (3) the Board erroneously faulted Dr. Cremer for working backward from the claim limitations (Indivior Br. 40-42); and (4) the Board misapplied precedent involving written description support for claimed ingredient ranges (Indivior Br. 31-40).   These arguments—which rest on blatant mischaracterizations of the Board's decision—all lack merit.

### 1.    The Board Did Not Require Express Disclosure

Contrary to Indivior's argument (Indivior Br. 31-33, 37-38), the Board did not require that the claimed ranges or their endpoints be disclosed "expressly," or "*in haec verba*," in the '571 application.

The Board clearly and explicitly recognized that, in evaluating whether a specification provides adequate description for a claim, "[i]t is not necessary that the exact terms of a claim be used *in haec verba* in the specification."  Appx81

(quoting *Nalpropion*, 934 F.3d at 1350). The Board stated that the correct standard is whether "one skilled in the art, reading the original disclosure, [would] . . . immediately discern the limitation at issue in the claims." Appx63 (quoting *Purdue Pharma*, 230 F.3d at 1323); *accord* Appx81 ("the law of written description is based on . . . whether a POSA would have 'immediately discerned the limitation at issue' from such disclosure" (quoting *Nalpropion*, 934 F.3d at 1350)).

The Board not only *recited* the correct legal rule, it also *applied* it. Reviewing the '571 application and the expert testimony, the Board found that "there is no mention of, *and a POSA would not have immediately discerned*, any polymer weight percentage 'endpoint' in the '571 application, other than the 'lower' endpoint disclosures." Appx65 (emphasis added); *see also* Appx81 ("a POSA, reading the '571 application, would not have immediately discerned the disputed limitations in claims 1, 5, 7, and 12"). That the Board did not require *in haec verba* disclosure is further evidenced by the fact that the Board found that "polymer weight percentages of 48.2 wt % and 58.6 wt %, as well as (b):(a) ratios of 1:2.8 and 1:10.9, . . . [are] supported by formulations disclosed in the '571 application, *notwithstanding the absence of any express disclosure* of those

values." Appx81 (emphasis added).[4]

Indivior argues that the Board's invocation of the correct legal standard means nothing, because the Board supposedly based its decision on Dr. Cremer's testimony that the application did not disclose any "*express*" upper limit in paragraph 65. *See* Indivior Br. 32.[5] But Indivior mischaracterizes the Board's reasoning, which did not turn on Dr. Cremer's admission alone. To the contrary, the Board relied on Dr. Das's testimony that there were no blaze marks in the specification that would have allowed a POSA to immediately discern an upper bound. *See* Appx64 ("the '571 application does not suggest, or reasonably convey to a POSA, . . . a 'top-end' of the claimed ranges" (citing Das testimony, Ex. 1003(¶61), *i.e.*, Appx1373(¶61))). The Board also relied on its finding that paragraph 65 and Table 5 both "lead a POSA away from concluding that the '571 application discloses the claimed polymer weight percentage" ranges, because paragraph 65 says that "any amount" of polymer may be used, and Table 5 discloses that some films with polymer weight percentages within the claimed ranges did not produce films bioequivalent to Suboxone® tablets. Appx64-65. Dr. Cremer's admission was simply one more piece of evidence supporting the

---

[4] To be sure, DRL disagrees with that finding, for the reasons given in support of its cross appeal.

[5] Indivior similarly takes issue with the Board's finding that "neither paragraph 65, nor Tables 1 or 5, *discuss or refer to* bounded or closed ranges of polymer weight percentages." Indivior Br. 32 (quoting Appx79).

Board's finding.  Appx65-66.  And in any case, Dr. Cremer was merely stating the obvious; the '571 application on its face discloses no upper limit on the percentage of polymer in the films.

Indivior's effort to manufacture legal error on this point is particularly strained, because it would have been odd for the Board *not* to discuss what the application does and does not expressly disclose.  While there is no *requirement* that a limitation be disclosed *in haec verba* in the specification, that does not mean that the absence of an express disclosure is irrelevant and must go unmentioned.  The absence of an express disclosure is one factor that might reasonably be considered in attempting to understand how a POSA would read the specification.  Indeed, this Court's decisions often discuss the presence or absence of an express disclosure in precisely that manner.  *See, e.g.*, *Quake v. Lo*, 928 F.3d 1365, 1374 (Fed. Cir. 2019) (analyzing written description by first finding that the claimed limitation is not "expressly described in the specification," and then finding that there are no "blaze marks" that would otherwise direct a POSA to the limitation); *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306, 1308 (Fed. Cir. 2008) (explaining that the statute "requires that the written description actually or inherently disclose the claim element," and agreeing with the district court's observation that it "cannot find a single reference in the written description which suggests that PowerOasis understood its invention to include the new matter that it

claimed for the first time in the CIP Application," before then turning to the expert evidence). Accordingly, Indivior's effort to turn the Board's recitation of Dr. Cremer's concession into a legal error is meritless.

### 2.    The Board Did Not Apply The Wrong Burden Of Proof.

Indivior's next legal argument is that the Board "misallocated the burden of proof," by requiring Indivior to "show that the broader described range supports the narrower claimed ranges," rather than requiring DRL to show that the broader described range does not support the narrower claimed ranges. Indivior Br. 42-47. The Board, however, expressly recognized that the burden of proof in this case rested on DRL. Appx9 ("In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable. This burden of persuasion never shifts to Patent Owner." (internal quotations omitted)); *see also* Appx81 n.15 ("we find that Petitioners have met their burden of persuasion as to claims 1–5, 7, and 9–14").

In reaching its findings and rulings—including but not limited to the question of written description support for the claimed ranges—the Board consistently described DRL's arguments, catalogued the evidence that DRL had marshalled in support of those arguments, and then stated whether it was crediting DRL's expert witness Dr. Das. *See* Appx12-50 (describing DRL's arguments and evidence); Appx64-65, Appx80 (summarizing conclusion with citations to DRL's

evidence and Dr. Das's declaration (Ex. 1003)); *see also* Appx65-70 (rejecting Indivior's arguments with citations to Dr. Das's testimony); Appx73-75 (finding Dr. Cremer not credible).    Indivior's complaint is not truly that the Board misallocated the burden of proof, but rather that the Board credited Dr. Das over its own expert, Dr. Cremer.    Again, the Board's decision as to which expert to credit is not a legal issue subject to de novo review, but a factual issue subject to substantial evidence review.  *See Yorkey*, 601 F.3d at 1284.  And on that issue, the Board's decision to credit Dr. Das over Dr. Cremer was supported by substantial evidence.  *See* pp. 51-57, *infra*.

### 3. The Board Correctly Found That Dr. Cremer Improperly Worked Backward From The Claims.

Indivior argues that the Board committed legal error by reasoning that "the proper analysis is from the standpoint of one with no foreknowledge of the [claim limitation]," and by faulting Dr. Cremer for "working backward from the disputed claim limitations."  Indivior Br. 40 (quotations omitted).  Specifically, Dr. Cremer suggested adding or dropping various ingredients from the films disclosed in Tables 1 and 5 of the '571 application, and testified that making those changes would result in films with polymer weight percentages matching the endpoints of the claimed ranges.  *See* Appx4151-4156(¶¶39-45), Appx4158-4159(¶48).  But, as the Board observed, Dr. Cremer's analysis could be achieved *only* by starting with the claims themselves, because:

> [T]he '571 application does not disclose or reasonably convey any direction or reason for a POSA to perform the specific calculations undertaken by Dr. Cremer, and Dr. Cremer conceded that one could obtain different weight percentage values depending on the variation of optional ingredients and amounts chosen.

Appx66; *see also* pp. 56-57, *infra* (substantial evidence section discussing optional ingredients).

Indivior's attack on the Board's rejection of Dr. Cremer's claims-first approach is wrong as a matter of law. To begin, the Board correctly quoted *In re Ruschig*, 379 F.2d 990, 995 (C.C.P.A. 1967), for the proposition that "the proper analysis," in considering the written description requirement, "is 'from the standpoint of one with no foreknowledge of the [claim limitation].'" Appx80. As the court in *Ruschig* explained, "[w]orking backward from a knowledge of [a claimed limitation], that is by hindsight, it is all very clear what route one would travel through the forest of the specification to arrive at [the limitation]." 379 F.2d at 995. But that is not how the written description analysis works; there must be "blaze marks" *in the specification* "which single out" the limitation. *Id. Ruschig*'s rejection of a "claims-first" written description approach is still the law. *See, e.g.*, *Novozymes A/S v. DuPont Nutrition Bioscis. APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013) (citing *Ruschig* in explaining that "[w]orking backward from a knowledge of [the claims], that is by hindsight," is a "flaw," and that the "proper vantage point" is "of one with no foreknowledge of the specific [claimed] compound").

Indivior argues that the normal rule against analyzing backwards from the claims is not applicable when evaluating whether there is written description support for a *numerical range*. According to Indivior, citing only *Wertheim*, "the analysis begins with the claimed ranges in hand and then evaluates whether those ranges have support." Indivior Br. 5; *see also id*. at 25 (same), 26 (same). But *Wertheim* said no such thing. Although the *Wertheim* court distinguished the facts of *Ruschig* from the facts of *Wertheim*, on the ground that *Ruschig* involved disclosure of a "broad generic chemical compound" whereas *Wertheim* involved the disclosure of a "range of solids content," *Wertheim* nowhere held that this means that *Ruschig*'s rule of presuming no knowledge of the claims does not apply to a range. *See Wertheim*, 541 F.2d at 264. Nor is counsel for DRL aware of any other case that has held as much.

To the contrary, since *Wertheim*, this Court has applied *Ruschig's* "blaze marks" requirement in cases involving numerical ranges such as *Purdue Pharma* and *General Hospital*. *See Purdue Pharma*, 230 F.3d at 1328 (applying *Ruschig*'s "blaze mark" analogy and holding that "[b]ecause the specification does not clearly disclose to the skilled artisan that the inventors of the '360 patent considered the $C_{max}/C_{24}$ ratio [of greater than two] to be part of their invention, it is immaterial what range for the Cmax/C24 ratio can be gleaned from the examples *when read in light of the claims*" (emphasis added)); *General Hospital*, 88 F.3d at 1372

(applying the blaze marks analogy to a limitation establishing a numerical range). The Board therefore committed no legal error in discrediting Dr. Cremer's backwards looking analysis.

### 4.    The Board Did Not Misapply Precedent Regarding Written Description Support For Claimed Ingredient Ranges.

Finally, Indivior argues that disclosure of a broader range always provides written description support for a claim to a narrower range. Indivior's attempt to turn this written description issue into a legal, rather than a factual, question is sorely misguided, and this Court should reject it.

1. Indivior's broader-includes-the-narrower argument relies entirely on its confident assertion that the '571 application "discloses a bounded range of 25% to 58.6%," which Indivior states in some form no fewer than *18 times*. Indivior Br. 5-6, 20 (twice), 26, 28, 43, 44, 45 (twice), 46, 55, 63, 64 (four times), 65, 66. Adding Indivior's more general assertions that some "bounded range" is "disclosed" or "described" in the application would have a multiplicative effect. *E.g.*, Indivior Br. 6 ("the '571 Application . . . discloses bounded polymer weight percentage ranges").

But Indivior's assertion is entirely false. On its face, the '571 application discloses no bounded polymer weight percentage range at all, and certainly no range of 25% to 58.6%. *See* pp. 8-14, *supra*. The application refers to an embodiment that has a polymer weight percentage of "at least 25%," and it refers

in Table 1 to a 2/0.5 mg strength film with three polymers that—if one did the math—add up 58.6%. But nowhere does the specification suggest that any upper bound for the polymer component is appropriate, or that 58.6% is that upper bound; to the contrary, it says that "any amount" of polymer may be used. With respect to the 2/0.5 mg strength film in Table 1, that table does not do the math to show the 58.6% figure, reciting only the weights of the individual polymers, which is significant given the specification's overwhelming emphasis on the importance of polymer selection and relative proportion, instead of total weight. *See* pp. 11-12, *supra*. Moreover, the application never even says that the specific 2/0.5 mg strength film described in Table 1 *worked*; it reports only that the applicants made it.

The '571 application's failure to disclose *any* bounded range for the polymer weight percentage stands in stark contrast to the application's express disclosure of bounded ranges with respect to many other aspects of the claimed films. *See, e.g.*, Appx3353(¶0013) (bounded ranges of Cmax ratios, AUCs, and pHs); Appx3358(¶0031) (bounded ranges for film size and dissolution rate); Appx3359(¶¶0032-0033) (bounded ranges for PEO proportion of total polymer component and PEO molecular weights); Appx3361-3363(¶¶0037-0039, 0041-0043, 0047) (bounded ranges for extenders, flow agents and opacifiers, plasticizers, materials to improve texture, and coloring agents); Appx3365(¶0056)

(bounded range for anti-foaming agent); Appx3368(¶0066) (bounded ranges for agonist and antagonist).  It also stands in stark contrast to the many cases on which Indivior relies, in which a bounded range was explicitly disclosed on the face of the specification.  *See* pp. 44-48, *infra*.

Indivior argues that there must be *some* unspecified upper bound for the polymer component's percentage by weight in the claimed film—because no one component in a composition can account for 100% of the total—and so under *Wertheim* the applicant was free to claim any upper bound below that unspecified amount.  *See* Indivior Br. 43-44 (quoting Dr. Cremer's testimony for the proposition that "the presence of other ingredients in the film compositions would result in a polymetric carrier matrix weight percentage of less than 100%"); *id*. at 49 ("At the upper end, 'the necessary presence of the actives and buffer and the option presence of other ingredients would place an upper bound on the polymer weight percentage ranges disclosed in the '571 Application.' Appx4167 ¶60 . . . ."); *id*. at 50 (invoking "the constraints imposed by 'the presence of other ingredients'"); *id*. at 55-56 (referencing the "upper bound" implied by "the necessary presence of the actives and buffer").

This argument must fail too.  While limitations need not be expressly disclosed, they cannot leave a POSA guessing.  The '571 application nowhere discloses the *minimum* weight of the non-polymer ingredients that might be used in

the allegedly inventive films, or the *maximum* weight of polymer that might be combined with the bare minimum of other ingredients in the films. Without such guidance concerning the minimum weight of the other components and the maximum weight of the polymer, the specification provides no *disclosure* of an upper bound for the polymer weight percentage. Precedent is clear that "[i]t is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to the modifications that the inventor might have envisioned, but failed to disclose." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (written description requirement not satisfied where there was "nothing in the . . . specification to suggest that shapes other than conical are necessarily a part of the disclosure"). Yet such speculation is all that Indivior offers.

In summary, the bounded range Indivior insists it sees in the '571 application is no more real than the emperor's new clothes, and the Board's eventual exasperation with Indivior's insistence that the application discloses some bounded polymer weight percentage range was palpable. *See* Appx68 ("Patent Owner's reasoning regarding a polymer weight percentage range of '25% to about 58.6%' seemingly ignores the absence of any disclosure that the polymer weight percentage of 58.6% is an endpoint or that any such bounded range was even

contemplated by the inventors, let alone disclosed."). Strip away Indivior's false assertion that the '571 application discloses a bounded range ending at about 58.6 wt %, and Indivior's broader-includes-the-narrower argument simply collapses.

2. Even assuming that the '571 application disclosed a bounded range (and it does not), Indivior primarily relies for its broader-includes-the-narrower argument on *In re Wertheim*, 541 F.2d 257 (C.C.P.A. 1976), a case decided almost a half-century ago and which has not been cited by this Court on the relevant issue in decades.[6] Indivior argues that since the '571 application discloses a range of "at least 25%," and in one example the three polymers happen to add up to 58.6%, then *Wertheim* required the Board, as a matter of law, to find that the claimed ranges of "about 40 wt % to about 60 wt %" and "about 48.2 wt % to about 58.6 wt %" are supported by the specification. *E.g.*, Indivior Br. 38-39.

Indivior's legal argument is wrong. *Wertheim* did not announce a broad legal rule that disclosure of a wide numerical range always provides written description support for a claim to some subset of that range. To the contrary, *Wertheim* stated that "[b]roadly articulated rules are particularly inappropriate in this area," 541 F.2d at 263, and that "[m]ere comparison of ranges is not enough,"

---

[6] *Wertheim* was most recently cited in a published decision a decade ago, for the uncontroversial proposition that, in analyzing written description, a jury is "required to consider how an ordinary skilled artisan would understand the text of the application." *Martek Bioscis. Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1371 (Fed. Cir. 2009).

*id.* It could not have been clearer that its holding was limited to the facts before it:

> We wish to make it clear that *we are not creating a rule applicable to all description requirement cases involving ranges*. Where it is clear, for instance, that the broad described range pertains to a different invention than the narrower (and subsumed) claimed range, then the broader range does not describe the narrower range.

*Id.* at 264-65 (emphasis added). *Wertheim*, then, stands for nothing more than the unremarkable proposition that a narrower range *can be* supported by the disclosure of a broader range, based on the facts of the particular case. In *Wertheim*, the court held that the broader described range of "25-60% along with specific embodiments of 36% and 50%" supported the narrower claimed range of 35-60% "as a factual matter." *Id.* at 65.

But the facts of this case are starkly different. The application in this case, unlike the application in *Wertheim*, does not expressly disclose a bounded range, much less a bounded range whose endpoints are near to those disclosed in the application. Indivior insists repeatedly that the '571 application at least implicitly discloses a bounded range of 25% to 58.6%, but that is wrong for all the reasons explained above. *See* pp. 34-38, *supra*. If accepted, Indivior's argument that some unspecified upper bound is inherent based on the presence of other ingredients, and so under *Wertheim* it may claim any upper bound below that unspecified number, would eliminate the need for an applicant *ever* to disclose an upper bound for an ingredient in a composition, and so it cannot be right. Indeed, the same radical

argument was rejected in *Wertheim*, in which the court held that the "upper limit of solids content described, i.e., 60%, is [not] inherent in 'at least 35%,'" 541 F.2d at 264, even though in *Wertheim* something less than 100% was no less an inherent upper bound. This Court should reject Indivior's identical argument here.

3. Even if *Wertheim* ever stood for the broad legal proposition Indivior insists it does (and it does not), this Court has adopted a more recent and more nuanced articulation of the law, in decisions such as *General Hospital* and *Purdue Pharma*, both of which support the Board's decision in this case.

*General Hospital*, on which the Board relied for one of its key findings, *see* Appx66 ("the disclosure of at least 25% (or at least 50%) 'does not by itself provide written description support for a particular value within that range'" (quoting *General Hospital*, 888 F.3d at 1372)), may be most directly on point. In that case, the Court expressly and unambiguously rejected Indivior's proposed legal rule, explaining that "[t]he disclosure of a broad range of values does not by itself provide written description support for a particular value within that range." 888 F.3d at 1372. "Instead, where a specification discloses a broad range of values and a value within that range is claimed, the disclosure must allow one skilled in the art to 'immediately discern the limitation at issue in the claims.'" *Id.* (quoting *Purdue Pharma*, 230 F.3d at 1323).

The claim term at issue in *General Hospital* was "about 6.6 x $10^{11}$ particles

per ml." *Id.* at 1370. The Board held that the disclosure in the specification of a broader range of "from less than 1 x $10^{11}$ particles per ml to some unidentified maximum," which would have included about 6.6 x $10^{11}$ particles per ml, nonetheless "d[id] not provide written description support for the claimed concentration of 'about 6.6 x $10^{11}$ particles per ml,'" explaining:

> As we stated in *Purdue Pharma*, "one cannot disclose a forest in the original application, and then pick a tree out of the forest and say here is my invention." The disclosure of a range of concentrations from less than 1 x $10^{11}$ particles per ml to some unidentified maximum, does not provide written description support for the claimed concentration of "about 6.6 x $10^{11}$ particles per ml," nor does the disclosure of particular discrete values within that range, none of which are the claimed value.

*Id.* at 1372 (citation omitted). Similarly, here, the disclosure in the '571 application of a polymer amount of "at least 25 wt %" or "at least 50 wt %," to "some unidentified maximum," *id.*, does not support ranges of "about 40 wt % to about 60 wt %," or "about 48.2 wt % to about 58.6 wt %," where neither the ranges nor even the concept of an upper bound were suggested by the specification. *See also, e.g.*, *In re Wako Pure Chem. Indus. Ltd.*, 4 F. App'x 853, 857 (Fed. Cir. 2001) ("In this case . . . the end-points of the recited range are not disclosed in the Japanese application; there is no indication in the disclosure of the Japanese application, for example, that the invention involves an $R^1$ moiety of three to eight carbon atoms, as opposed to one to ten.")

This Court's decision in *Purdue Pharma*, cited in *General Hospital* and by the Board below, also is instructive.  In *Purdue Pharma*, the Court explained that "[i]n order to satisfy the written description requirement, the blaze marks directing the skilled artisan to that tree must be in the originally filed disclosure."  230 F.3d at 1326-27.  The claims at issue in *Purdue Pharma* were directed to the administration of opioids for treating pain, where the maximum amount of drug in the bloodstream ($C_{max}$) is more than twice the amount of drug in the bloodstream after 24 hours ($C_{24}$).  *Id.* at 1322-23.  The court observed that "[a]lthough the examples provide the data from which one can piece together the $C_{max}/C_{24}$ limitation, neither the text accompanying the examples, nor the data, nor anything else in the specification emphasizes the $C_{max}/C_{24}$ ratio."  *Id.* at 1326.  Because there were no "blaze marks" directing a POSA to the claimed limitation, the limitation was not disclosed.  *Id.*

There are no blaze marks here, either.  As in *Purdue Pharma*, although "the examples [in the '571 application] provide the data from which one can piece together" certain polymer weight percentages, "neither the text accompanying the examples, nor the data, nor anything else in the specification in any way emphasizes" the polymer weight percentage, nor do they emphasize the polymer weight percentage ranges claimed in the '454 patent.  *Id.*  In fact, as the Board found, paragraph 65 and Table 5 would have directed a POSA *away* from the

claimed ranges, by instructing that "*any* desired level" of polymer weight percentage may be used and by disclosing polymer weights—"at least 25%"—*outside* the claimed range.  Appx64-65; *accord Purdue Pharma*, 230 F.3d at 1326 (noting that "the specification also contains examples in which the $C_{max}/C_{24}$ ratio is less than two and . . . nothing in the specification indicates to the skilled artisan which examples embody the claimed invention and which do not").

Remarkably, Indivior's brief never once mentions *General Hospital*, despite the Board having quoted it in support of a key finding.  *See* Appx66.  Indivior does try to distinguish *Purdue Pharma* on the ground that the specification in that case did not refer to the concept of a "$C_{max}/C_{24}$ limitation," whereas here, the specification "expressly disclose[s]" (in paragraph 65) a "polymer weight percentage."  Indivior Br. 56-57.  But while the Court in *Purdue Pharma* observed that the specification did not mention a "$C_{max}/C_{24}$ limitation," it did not hold that the mere mention of that concept would have been a sufficient "blaze mark" to satisfy the written description requirement for the specific claim limitations.  In that regard, the limitation at issue here is not the existence of polymer weight percentage generally, but rather a specific range of polymer weight percentages.  And nowhere does the '571 application provide any blaze marks that would direct a POSA to the particular polymer weight percentage ranges claimed by the '454 patent.

4.  The other cases on which Indivior relies, *see* Indivior Br. 33-37, 39-40, are readily distinguishable.

At issue in *In re Blaser*, 556 F.2d 534 (C.C.P.A. 1977), was a limitation of water amount of 1.2 to 1.5 mols (for some claims) and 1.2 to 1.6 mols (for another claim).  *Id.* at 537.  The Board found that the range of 1.2 to 1.5 mols "was supported [in the specification] as a preferred range in working examples 1-6." *Id.* Without discussing the content of the examples, the Court agreed.  It held that the 1.2 to 1.6 limitation was disclosed by the same examples and a separate express disclosure that "the share of the water may be up to 1.6 mols." *Id.* at 538.  In the instant case, of course, unlike in *In re Blaser*, no upper limit is disclosed.  *See* pp. 34-40, *supra*.  In addition, the Court in that case was applying the deferential substantial evidence standard to the Board's decision that the examples *did* support the range, whereas this Court is reviewing a decision that the examples *did not*.

The issue in *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991), was whether drawings of catheters disclosed that the "return lumen" of the catheter have a "diameter substantially less than 1.0 but substantially greater than 0.5 times the diameter of the combined lumens." *Id.* at 1566.  The patent owner's expert explained that a POSA studying the drawings "would have understood from them that the return lumen must have a diameter within [that] range," because any different diameter would create problems for pressure in the catheters. *Id.*  The

district court found this reasoning "logical," but held that the written description requirement was not satisfied because the drawings did not "necessarily exclude" all other diameters. *Id.* This Court held that this was the wrong standard; the correct question was whether the drawings "conveyed with reasonable clarity to those of ordinary skill" that the inventor possessed the later-claimed invention. *Id.* Because the patent owner had submitted an expert declaration saying as much, and the challenger had submitted "no technical evidence to refute [that expert's] conclusions," there was a genuine issue of material fact that precluded summary judgment. *Id.* at 1567. *Vas-Cath* is inapposite here, because the Board did not require the '571 application to exclude all other possible polymer ranges, and there was conflicting expert testimony as to how to interpret the application, and the Board credited DRL's expert over Indivior's expert.

Three more cases on which Indivior relies—*Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1537-39 (Fed. Cir. 1997), *Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals International Ltd.*, 887 F.3d 1117, 1121, 1136-37 (Fed. Cir. 2018), and *Nalpropion*, 934 F.3d at 1349-51, *see* Indivior Br. 36-37, 39-40—all involve appeals from bench trials in which the judge found the written description requirement satisfied. Comparing those cases to this one is comparing apples-to-oranges, because here the question is whether *substantial evidence* supports the Board finding that the claims *lack* written description support, whereas in those

cases the question was whether the district court had *clearly erred* in finding that the claims *had* support.

Standard of review aside, all three cases are distinguishable on their facts. In *Kolmes*, the specification disclosed a bounded range of "4–12 turns per inch, with 8 turns per inch being preferred," and the court held that the district court had not clearly erred in holding that this disclosure supported the claimed range of "8–12 turns per inch." 107 F.3d at 1539. *Kolmes* is nothing like the instant case. Here, there is no bounded range disclosed, and nowhere does the specification disclose any upper bound, or state that some weight percentage is "preferred." To the contrary, the specification says that "any desired level" of polymer may be used.

In *Vanda*, the disputed limitation recited a dose of a drug for treating schizophrenia of "12 mg/day or less," and the specification disclosed that the preferred dose was "18, 12, or 6 mg per day." 887 F.3d at 1136-37. The patent owner also introduced testimony that the specification advised reducing the dose of 24 mg/day by a "factor of 1.5 to 3.5"—i.e., to a *range* between about 7 and 16. *Id.* at 1137. On that record, the court held, "we cannot say the district court clearly erred" in finding the claimed range disclosed. *Id.* There are no similar facts here; there is no range expressly disclosed and no credible testimony that any range was implicitly disclosed, nor is there any statement in the specification as to what would constitute a "preferred" amount of polymer, other than that "*any* desired

level" of polymer may be used.

Finally, the claims at issue in *Nalpropion* recited the administration of naltrexone to treat obesity.   934 F.3d at 1349.   The claims called for the compounds to be administered in a "sustained release formulation," with "between 39% and 70% of naltrexone released in one hour" and "between 62% and 90% of naltrexone released in two hours."   *Id.* at 1347.   The district court found adequate written description in two examples, one of which showed 39% of naltrexone released in one hour and 62% in two hours, and the other which showed 67% released in one hour and 85% released in two hours.   *Id.* at 1348.   The range established by the two examples—39% to 67% in one hour and 70% to 90% in two hours—lined up almost perfectly with the claim, and the district court held that this disclosure—along with credible expert testimony—satisfied the written description requirement.   *Id.* at 1351.   This Court affirmed, finding no clear error.   *Id.*   The facts are different here; most notably, in *Nalpropion* there were no disclosures in the specification that would have *warned a POSA away* from the claimed ranges; here, the Board found that there were.   Appx64-65.   Moreover, in *Nalpropion* the patent owner had credible testimony on its side, whereas, here, Indivior seeks to support its argument with testimony the Board found not credible and not persuasive.

\* \* \*

In sum, the Board's written description analysis with respect to the issue of numerical ranges is not wrong as a matter of law. The cases Indivior cites involve facts and standards of review far more favorable to the patent owner than this case. Moreover, to the extent there is any tension between older decisions such as *Wertheim* and the Board's decision in this case—and there is not, because *Wertheim* explicitly stated that it was announcing no hard and fast rule—the Board's decision is well supported by this Court's more recent decisions in *General Hospital* and *Purdue Pharma*.

### C.    The Board's Decision Is Supported By Substantial Evidence.

Turning to the substantial evidence inquiry, most of Indivior's brief is simply a recitation of what Dr. Cremer testified, as if this were an appeal from a trial or Board decision that Indivior won, such that Indivior might prevail on appeal by pointing to credible evidence in its favor. But of course, the procedural posture of this case is the very opposite. The Board held for DRL, finding as a matter of fact that the polymer weight percentage ranges claimed in the '454 patent did not have written description support in the '571 application. The Board reached this conclusion based on the face of the application, on the exhibits, and on the credible testimony of DRL's expert, Dr. Das. *See* Appx64-65 (citing the '571 application and Dr. Das's declaration (Exhibit 1003)); pp. 17-21, *supra* (description of Board's decision). The Board also found that Dr. Cremer was not a

- 48 -

credible witness.  *See* Appx73-75.

Indivior scarcely acknowledges the Board's findings, and largely ignores the record evidence that the Board cited.  The Court should reject all of Indivior's arguments, which do not come close to demonstrating that the Board's decision was unsupported by substantial evidence.

### 1.    The Board's Findings Were Supported By Substantial Evidence

There unquestionably was substantial evidentiary support for the Board's factual finding that the claimed aggregate polymer weight percentages were not adequately disclosed by the '571 application.

As the Board found, "paragraph 65 of the '571 application, and original claim 5, are the *only discussion* in the '571 application of the amount of polymer that should be in the film compositions, and only describe open-ended ranges." Appx64 (emphasis added).  The Board supported that finding with the application, which indisputably discusses the amount of polymer only in paragraph 65 and claim 5, as well as with Dr. Das's testimony that paragraph 65 provides the "only disclosure" of the amount of polymer.  *See* Appx64; Appx1373(¶60).

The Board found that neither paragraph 65 nor the rest of the '571 application "suggest[s], or reasonably convey[s] to a POSA, a 'bottom end' of the claimed ranges (40 wt % or 48.2 wt %) or a 'top-end' of the claimed ranges (60 wt % or 58.6 wt %)," and it quoted Dr. Das's declaration testimony in which she

explained the same. Appx 64 (quoting Appx1373-1374(¶61)). In addition to that evidence, the Board also cited Dr. Cremer's testimony that a POSA would not understand paragraph 65 to disclose "an upper limit" to any range. Appx65-66 (quoting Appx3824-3826). And, relying on *General Hospital*, 888 F.3d at 1372, the Board held that the mere disclosure in paragraph 65 of "at least 25%" or "at least 50%" "does not by itself provide written description support for a particular value within that range." Appx66 (quoting *General Hospital*, 888 F.3d at 1372).

The Board also found that the application:

> does not reasonably convey to a POSA any focus or emphasis on the amount of polymer in the film composition, referring instead [in paragraph 65] to "any desired level" of polymer such that a self-supporting film composition is provided, and does not reasonably convey to a POSA any indication that particular polymer weight percentages, let alone ranges thereof, impart any desirable properties in the films, focusing instead on pH based on the amount of buffer in the film composition.

Appx64-65. For that finding, the Board relied on paragraph 65 in the specification. Appx65. It also relied on Dr. Das's testimony that "[t]here is . . . no disclosure in the '571 application that links the amount of polymer with any of the desired or purportedly inventive characteristics of the film," Appx1374(¶62), and that the application does not identify the polymer component as a consideration that "affect[s] absorption and mucoadhesion," Appx1379(¶72). *See* Appx65 (quoting Das Declaration ¶¶62, 63, 71, 72, 75, 76).

More than simply not disclosing the claimed invention, the Board also found that the application *taught away* from the claimed invention.  The Board found, that the ranges disclosed in paragraph 65—"e.g., at least 25% by weight of the composition"—"rather than providing guidance to a POSA to specific bounded ranges, lead a POSA away from concluding that the '571 application discloses the claimed polymer weight percentage ranges."  Appx64.  The Board supported this finding with Dr. Das's testimony that the application provides "minimal guidance" on the amount of polymer, and that Test formulations 1 and 3 had polymers within the claimed ranges but did not produce films that were bioequivalent to Suboxone®.  *See* Appx64-65 (citing Appx1373-1374(¶61), and Appx1381-1384(¶¶76-80)).  The Board found that "Table 5 of the '571 application also leads a POSA away" from the claimed polymer ranges "because Test formulation 1 and Test formulation 3 had polymer weight percentages of 50.6% and 48.2%, respectively, that fell within the claimed ranges, but did not produce films bioequivalent to Suboxone® tablets."  Appx65.

### 2. Indivior Relies Almost Exclusively On The Opinions Of Its Expert, Whose Opinions The Board Found Not Credible.

Despite the Board's thorough and careful analysis, Indivior insists that the Board's decision was unsupported by substantial evidence.  Throughout its brief, Indivior argues that Dr. Cremer's testimony required the Board to find that the claimed polymer weight percentage ranges have written description support in the

'571 application.  But the opinions Indivior points to are the same opinions the Board found not credible and not persuasive, and Indivior provides no reason why the Board was wrong, let alone why "no reasonable trier of fact" would have agreed with the Board's credibility determinations.  *See Yorkey*, 601 F.3d at 1284.

As explained above, Indivior's insistence notwithstanding, the '571 application nowhere describes any bounded range for the polymer weight percentage, much less a bounded range of 25 to 58.6%.  Table 1 provides a single example with three polymers that—if one did the math—add up to 58.6%, but:  (1) the application nowhere suggests that a bounded range is appropriate for total polymer weight percentage, in contrast to the many bounded ranges it provides for other film ingredients; (2) Table 1 does not indicate the aggregate 58.6% figure, indicating instead the weights of the individual polymers selected, after the application spent many paragraphs emphasizing the importance of polymer types and their relative proportions; (3) the application nowhere suggests that 58.6% should be considered the upper endpoint of a range; (4) the unstated 58.6% percentage relates only to a single example of a 2/0.5 mg strength film; and (5) the specification never discloses whether that single example film worked for purposes of the invention.  *See* pp. 34-38, *supra*.

Thus, when Indivior insists throughout its brief that the '571 application discloses a bounded range ending at 58.6%, what it really means is that *Dr. Cremer*

*testified* that a POSA would have discerned that range from the application. But the Board was correct to reject Dr. Cremer's testimony, and instead to credit Dr. Das's testimony that a POSA would have discerned neither a bounded range generally, nor the claimed bounded range in particular.

For example, Indivior recounts that "Dr. Cremer explained that a POSA would have understood" that the films disclosed in Table 1 with aggregate polymer weight percentages of 48.2% and 58.6% "pertained to the same invention," and therefore would also have understood that the inventors possessed "the polymer weight percentages between those two values," as well as polymer weight percentages between 40% to 60% that might be derived by adding and subtracting ingredients from the Table 1 formulations. Indivior Br. 54-55, 60-61, 62. But Dr. Cremer's testimony was conclusory; he stated, *without any support or explanation whatsoever*, that changes in polymer weight percentages within these ranges would have no effect on the "operability" of the films, and that films within these ranges would "generally [have] the same properties." Appx4156(¶45), Appx4159-4160(¶¶49-50). He then conceded at his deposition that he had relied on no scientific literature to support this opinion. Appx3846-3848. The Board was within its right not to credit Dr. Cremer's conclusory testimony. *Cf. D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018) (conclusory expert assertions did not give rise to a genuine issue of material fact for purposes

of written description).

Even beyond its conclusory nature, the Board had good reason not to credit Dr. Cremer's testimony. The Board observed that Dr. Cremer would not answer the question, posed at his deposition, whether there would be any difference in operability of films within the claimed ranges. Appx73-74. Specifically, while Indivior argues that films with polymer weight percentages of between 40 and 60 percent (the '454 patent claim 1 range) are all the same invention for purposes of *Wertheim*, this colloquy occurred at Dr. Cremer's deposition:

> Q: "What about the difference between 40 percent and 48.2 percent? Would you expect any difference in operability or ability to achieve a desired results between those—with that difference?"
>
> A: "I haven't looked—I haven't thought about that." . . . . "I don't think I've performed the analysis of 40 percent versus 48.2 percent. So I would like to not say anything about that."

Appx3878-3879. "In our view," the Board explained, "it is not credible to assert that films having polymer weight percentages within a range pertain to the same invention, but then be unwilling to say whether films having particular polymer weight percentages within that range also pertain to the same invention." Appx74. Indivior does not even acknowledge this credibility finding, let alone try to explain

why it is incorrect.[7]

Taking another tack, Indivior argues that Dr. Cremer explained that the lower bounds of "at least 25%" and "at least 50%" were sufficient because "the necessary presence of the actives and buffer and the optional presence of other ingredients would place an upper bound on [these disclosed] polymer weight percentage ranges," Indivior Br. 56, and given the present of optional ingredients, a POSA "would have understood that the inventors possessed the polymer weight percentage range of 25% to about 58.6%." Indivior Br. 64. But Dr. Cremer's optional ingredients calculation was speculative and unpersuasive. Dr. Cremer derived the range of 25% to 58.6% by looking at Tables 1 and 5 in the '571 application and deciding which of the ingredients he thought were optional. He said these optional ingredients could be varied in a "reasonable" amount, and it "would not change" the film's properties. Appx4152(¶40). But he refused at his deposition to explain what a "reasonable" amount meant, stating only that it "mean[s] not unreasonable amounts," and acknowledging that he had not pulled the term "reasonable" from the application. Appx3844-3845.

---

[7] Indivior argues only that *Blaser* and *Nalpropion* support Dr. Cremer's interpretation of the patent as disclosing the ranges between the polymer weight percentages of the examples in Table 1 and 5. Indivior Br. 63. But, as already explained, those cases are distinguishable. In *Blaser*, an upper limit was expressly disclosed. And in *Nalpropion*, the district court found that the expert credibly interpreted two examples that lined up almost perfectly with the claimed ranges to support the claimed ranges. *See* pp. 44, 47, *supra*.

Dr. Cremer's opinions also were flawed because, as discussed above, he varied the amounts of the supposedly optional ingredients, either adding or removing them, based on a claims-first approach to written description analysis. *See* pp. 31-34, *supra*.  As explained above, however, the written description analysis cannot start with the claims, and then hunt and peck through the specification for evidence that might be cobbled together to support them.  Instead, the question is what might a POSA might "immediately discern" starting with the specification.  Pp. 31-34, *supra*.  That legal standard is fatal to Dr. Cremer's analysis, because he conceded that he made the crucial decision to add or drop certain ingredients and by how much, not because the specification directed it, but instead in an effort to match the claimed polymer percentage ranges.  *See, e.g.*, Appx3852-3853 (Q:  "There's no instruction in Example 1 to disregard the flavor and the sweetener in the Table 1 formulations, right?"  A:  "POSA would not expect instructions like that in the table").  Appx3855-3856 (Q:  "You might end up with different numbers depending on which variation you took, right?"  A: "[I]f you mean that my choices are just examples and there could be more, that's correct.  There could be more examples.");  Appx3854 (Q:  "If you had only removed the flavor and not the sweetener [in Example 1], you would have gotten a different number, right?"  A:  "Yes.");  Appx3889 (Q:  "There could have been other numbers that you came to based on how you did the calculations, right?"  A:

"There could be other examples.  Yes.").

At bottom, Dr. Cremer really seemed to be asking by his analysis whether films within the ranges claimed in the '454 patent would be obvious in light of the '571 application; he concluded that because a POSA might experiment by adding or subtracting ingredients, they might eventually make films within the claimed ranges.  Appx4151-4154(¶¶39-42), Appx4156(¶45).  But that is not the right question, as this Court has made clear:

> Lockwood argues that the district court erred by looking solely at the applications themselves.  We do not agree.  It is the disclosures of the applications that count.  Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed.  It extends only to that which is disclosed.  While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification.  *The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification.*  Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.

*Lockwood*, 107 F.3d at 1571-72 (emphasis added).  Here, whether or not Dr. Cremer's hypothetical compositions are "an obvious variant" of the examples disclosed in the '571 application is irrelevant.  They were not disclosed, and that is the end of the matter.

### 3. The Board Did Not Introduce Any Inconsistency In Its Decision By Finding That The Polymer Weight Percentage Is "Important."

Indivior also places great emphasis on the Board's finding that the amount of polymer in the film is "important" because it impacts the "properties" of the film. Indivior Br. 48, 53-54. Indivior argues that this finding "contradicts" other findings the Board made, and that this contradiction warrants reversal. But there is no contradiction and, to the extent there is any tension, it is unclear why it matters.

Indivior argues the Board's finding that the amount of polymer is "important" contradicts its finding that the '571 application did not convey "any focus or emphasis on the amount of polymer" in the composition. Indivior Br. 48 (quoting Appx64, Appx69). But the Board only stated that the amount of polymer is "important" because there must be enough polymer to prevent the film from falling apart. Appx69 (because "the level of polymer should be sufficient to provide a self-supporting film composition, a POSA reading the '571 application would have considered the amount of polymer chosen by the POSA to be 'important' to the film composition"). That there must be sufficient polymer to maintain structural integrity might suggest some bottom end of a range, as the '571 application indicates by teaching preferred embodiments "at least 25%" and "at least 50%," but it does not disclose that the range is bounded anywhere at the top, nor does it disclose any particular range (much less the specific ranges claimed in

the '454 patent).   Indeed, Indivior acknowledges (at 50), that the question is whether the '571 application discloses the *particular* polymer weight percentage ranges claimed in the patent.  Whether the amount of the polymer is a "focus," an "emphasis," or "important" to the invention does not answer that question. Because there is no "direct conflict" between the Board's findings, *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1323 (Fed. Cir. 2017), *see* Indivior Br. 48, is inapplicable here.

### 4.    The Board Did Not Misinterpret Table 5.

As noted above, as one of the many bases for its holding, the Board observed that Table 5 would have led a POSA away from the claimed ranges, because it showed that two films with polymer weight percentages within the claimed ranges (50.6% and 48.2%) did not embody the invention.   Appx65. Indivior says this is wrong, because "Table 5 merely shows that films with polymer weight percentages in the claimed ranges might not be within the disclosed invention if they do not meet *other* claim limitations, such as limitations relating to the absorption of active ingredients."  Indivior Br. 60.

This argument fails.  Indivior cites nothing in the '571 application to support this reading of Table 5.  The '571 application certainly says no such thing; it merely discloses the composition of the three formulations, and that the three formulations were "analyzed."   Appx3376(¶¶0089-0090).   It then reports the

results of each test formulation—i.e., whether or not the film was bioequivalent to the Suboxone® tablet.    Appx3376-3381(¶¶0089-00104).    It *does not* report whether the results were due to the changed pH level or some other factor, such as the change in polymer weight percentage, or some combination of the two.  *See* Appx3376-3381(¶¶0089-00104).

Nor does Indivior point to any testimony from either expert to support its interpretation of Table 5.  Indivior cites Dr. Das's testimony that "[t]he *purpose* of the test . . . was to evaluate the impact that differing the amount of buffers (and therefore the pH) had on the absorption of buprenorphine and naloxone."  Indivior Br. 60 (quoting Appx1381-1382(¶76)).  But while the "purpose" of Table 5 may indeed have been to test different pH levels, there is nothing in the '571 application that would indicate to a POSA that the two films failed due to the different pH levels, nor did any expert testify as much.  Indivior also cites Dr. Cremer's testimony that "a POSA would have understood that the exemplary formulations in Table 1 and Test formulation 2 in Table 5 all pertained to the invention," Indivior Br. 60, but those formulations are irrelevant.  The question is what a POSA would have made of Test formulations 1 and 3 in Table 5, and on that question, Dr. Cremer had no opinion.  *See* Appx4174 n.7 ("I have not included in my analysis Test Formulations 1 and 3 disclosed in Table 5.").

## III.    THE BOARD ERRED IN HOLDING THAT CLAIM 8 HAS WRITTEN DESCRIPTION SUPPORT IN THE '571 APPLICATION.

The Board erred in holding that the '571 application provides written description support for claim 8's limitation that the polymer make up "about 48 wt %" of the film.[8]  The Board based that decision entirely on Tables 1 and 5.  But the Board's decision overlooks a fundamental problem with the examples in those tables:  they disclose only a film that contains a *particular combination of polymers*—a blend of low and high molecular weight PEOs and HPMC—that, if their weights are aggregated, account for 48.2% of the film's weight.  The specification nowhere mentions the 48.2% figure, and it never suggests that the inventors possessed all films containing any combination of polymers adding up to 48.2% of the film's weight.

For a claim limitation to be adequately disclosed for the purposes of the written description requirement, the specification must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed" and "reasonably" convey to those skilled in the art "that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Put another

---

[8] The same standard of review that applies to the written description question in Argument Section I apply here as well: questions of law are reviewed de novo, and questions of fact for substantial evidence. *See* pp. 25-26, *supra*.

way, "one skilled in the art, reading the original disclosure, must *immediately discern* the limitation at issue in the claims." *Purdue Pharma*, 230 F.3d at 1323 (emphasis added).  This standard was not met for claim 8, for two fundamental reasons.

*First*, a POSA reading the '571 application would not "immediately discern" that the tables disclose a polymer component that makes up 48.2% of the total film. The tables do not state the total polymer weight of the disclosed films.  Table 1 gives only the weights of each specific polymer; as Dr. Das testified, a POSA would have to "back-calculate[ ]" the weights as a percentage of the total weight of the film by adding up the weights of the individual polymers, dividing by the total weight of the film, and multiplying by 100.  Appx1381(¶75).  Dr. Cremer agreed. *See* Appx4172(¶68) (acknowledging that a POSA would have had to "calculate" the polymer weight percentages in Tables 1 and 5).  The tables do not provide this direction; a POSA would have to make the move on her own.

To be sure, a limitation need not be disclosed explicitly.  *See* p. 26, *supra*. But, the application nowhere discloses that the aggregate amount of polymer has any implications for the functioning of the film, once there is merely enough to keep the film from falling apart, and so provides no impetus for a POSA to perform this calculation.  "There is no direction in the application," Dr. Das explained, "that the inventors gave any import to these specific values for those

specific ingredients in that specific table when they filed their patent application." Appx1381(¶75); *accord* Appx1374(¶62) ("There is no disclosure in the '571 application that links the amount of polymer with any of the desired or purportedly inventive characteristics of the film.").  The Board essentially agreed, finding that "the '571 application does not reasonably convey to a POSA any focus or emphasis on the amount of polymer in the film composition, referring instead [in paragraph 65] to 'any desired level' of polymer," so long as the film holds together.  Appx64; *see also* Appx69 (POSA reading the application would have considered the polymer amount "important" only to the extent it must "provide a self-supporting film composition").  For these reasons, and as Dr. Das testified, there are no "blaze marks" in the '571 application such that a POSA would have "immediately discern[ed]" that the inventors were in possession of films containing all polymer blends adding up to 48.2 wt %.  *See Purdue Pharma*, 230 F.3d at 1323, 1326-27 (written description requirement not satisfied where the specification did not "in any way emphasize[]" the claimed $C_{max}/C_{24}$ limitation, and where nothing in the specification would have "motivate[d] [a POSA] to calculate" the claimed ratio from the examples in the specification); *see also* Appx4325-4327 (Dr. Das:  "[t]here is nothing pointing saying that the 48.2% was important," and "there are no blazemarks that point out to [that] specific percentage[] for any reason").

- 63 -

*Second*, a POSA reading the '571 application would not immediately discern that the inventors possessed films with a polymer component that makes up 48.2% of the total film, *no matter the combination of polymers*. Table 5 discloses, at best, that a film made using a combination of four *specific* polymers, in the *individual* amounts specified, was successful. And elsewhere, the specification makes clear that polymers are not all interchangeable. The specification expressly states that "it is desired to select polymers that provide mucoadhesive properties to the film, as well as a desired dissolution and/or disintegration rate." Appx3358(¶0030). The application teaches that whether a film is fast dissolving or slow dissolving generally is determined by the polymers' molecular weight, and that "[f]or the instant invention, it is preferable to use films that fall between the categories of fast dissolving and moderate dissolving." Appx3354(¶0020). It explains that PEO may be used, and that the molecular weight of the PEO is linked to the film's properties: "[i]n some embodiments, high molecular weight polyethylene oxide . . . may be desired to increase mucoadhesivity of the film," whereas in "other embodiments," lower molecular weight PEO is used. Appx3359(¶0033). It goes on to state that "it may be desirable to combine high molecular weight (600,000 to 900,000) with low molecular weight (100,000 to 300,000) polyethylene oxide in the polymer component." *Id*. And it observes that PEO may be used in combination with other polymers, including "hydroxypropylmethyl cellulose," or

"HPMC," and provides ranges for the proportion of PEO if used in combination with HPMC or another polymer.  Appx3359(¶0032).

Sure enough, Tables 1 and 5 show a combination of three PEOs of different molecular weights, together with some HPMC.  In these circumstances, where the specification discloses that polymers will not all function similarly in the claimed invention, a single example of a successful film whose polymers happened to add up to 48.2 wt % is not sufficient to show possession of all films with polymers that add up to 48.2 wt %, no matter the blend of polymers.  *See In re Curtis*, 354 F.3d 1347, 1355 (Fed. Cir. 2004) ("where there is unpredictability in performance of certain species or subcombinations other than those specifically enumerated, one skilled in the art may be found not to have been placed in possession of a genus or combination claimed at a later date"); *see also Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332, 1347 (Fed. Cir. 2013) ("written-description requirement must focus on whether the way in which the (broader) claim term differs from the (narrower) disclosure is pertinent to fulfilling the identified purposes of the claims at issue").  The Board therefore lacked substantial evidence for its finding that claim 8 has adequate written description support, and the Court should reverse the Board's finding with respect to Claim 8 only.

## CONCLUSION

The Court should affirm the Board's holding that claims 1-5, 7, and 9-14 of

the '454 patent are unpatentable, and reverse the Board's holding that DRL did not

demonstrate that claim 8 of the '454 patent is unpatentable.

Respectfully submitted,

/s/ *Kevin P. Martin*

| | |
|---|---|
| Ira J. Levy | Kevin P. Martin |
| Alexandra D. Valenti | Elaine Herrmann Blais |
| GOODWIN PROCTER LLP | Robert Frederickson, III |
| 620 Eighth Avenue | Edwina B. Clarke |
| New York, NY 10018 | GOODWIN PROCTER LLP |
| Tel.: 212.813.8800 | 100 Northern Ave. |
| Fax.: 212.355.3333 | Boston, MA 02210 |
| | Tel.: 617.570.1000 |
| | Fax.: 617.523.1231 |

*Counsel for Cross-Appellants Dr. Reddy's Laboratories S.A. and Dr. Reddy's Laboratories, Inc.*

February 18, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2021, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF system. Counsel for all parties to this case are registered CM/ECF users and will be served by the CM/ECF System.

/s/ *Kevin P. Martin*
Kevin P. Martin

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), it contains 15,418 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-scale requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point Times New Roman, a proportionally spaced typeface.

February 18, 2021                                          /s/ *Kevin P. Martin*
                                                                      Kevin P. Martin